IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE INTEREST OF RYKER R. & AMIRA'LYNN W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF RYKER R. & AMIRA'LYNN W., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

RONNIE S., APPELLANT, AND TASHA R., APPELLEE AND CROSS-APPELLANT.

Filed September 23, 2025.    No. A-25-025.

Appeal from the Separate Juvenile Court of Lancaster County: ELISE M.W. WHITE, Judge. Affirmed.

Heather S. Colton, of Pollack & Ball, L.L.C., for appellant.

Angelica W. McClure, of Kotik & McClure Law, for appellee and cross-appellant.

Danielle M. Kerr, Deputy Lancaster County Attorney, for appellee and cross-appellee.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.
WELCH, Judge.

## I. INTRODUCTION

Ronnie S. has appealed the termination of his parental rights to his son, Ryker R. Tasha R. has filed a cross-appeal regarding the termination of her parental rights to Ryker and Amira'Lynn W. Both Ronnie and Tasha assert that the juvenile court erred in finding that statutory grounds existed to support termination of their parental rights, and that termination was in their children's best interests. For the reasons stated herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Tasha is the biological mother of Ryker, who was born in July 2020, and Amira'Lynn, who was born in April 2022. Ronnie is Ryker's biological father. Matthew W. is Amira'Lynn's biological father and is not part of this appeal and therefore is addressed only as needed to provide context.

### 2. PRIOR DHHS INVOLVEMENT

As relevant to this appeal, during a prenatal appointment while Tasha was pregnant with Ryker, Tasha tested positive for methamphetamine, amphetamines, and marijuana, and when Ryker was born, both he and Tasha tested positive for amphetamines. Following the delivery, Ryker was in respiratory distress and placed in the neonatal intensive care unit. Following this discovery, the Department of Health and Human Services (DHHS) removed Ryker from Tasha's care.

Although Tasha alleged that Ronnie was Ryker's father, Ronnie did not sign Ryker's birth certificate despite being present at the hospital. At some point, Ronnie signed an acknowledgment of paternity. At the time of Ryker's removal, DHHS noted that Ronnie had a history of substance abuse related charges, including a pending possession of marijuana charge from late May 2020 and a pending possession of methamphetamine charge from July 2020.

In August 2020, the Lancaster County Separate Juvenile Court adjudicated Ryker as a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). In April 2022, Ronnie sought counsel in order to intervene in Ryker's juvenile case. Counsel was appointed for Ronnie and, although the court granted Ronnie's motion for genetic testing, that testing was not completed because Ronnie absconded from probation. Prior to absconding, Ronnie attended some of the court hearings and meetings and attended visitation with Ryker. The case was closed successfully with Ryker returning to Tasha's care in October 2022 with no legal determination of the paternity of Ryker.

### 3. PRESENT CASE

On May 4, 2023, the State filed a petition in the juvenile court alleging that Ryker and Amira'Lynn lacked proper parental care by reason of the fault or habits of Tasha. That same day, the State filed a motion for emergency temporary custody after law enforcement received a report about an unsupervised toddler walking in an alley. Upon responding, officers located the toddler, identified as Ryker, walking alone in an alley, wearing a soiled diaper. He was otherwise unclean and had scratches and bruises on his face and body. Law enforcement contacted Tasha, who was in a residence about a block away with the front door open. Tasha was unaware that Ryker had been missing for about an hour. Tasha informed officers that she left Ryker downstairs watching television with a sleeping friend. Law enforcement also located two other recent reports regarding the lack of care of Tasha's children and the unsanitary living conditions of her residence. The juvenile court granted the State's motion for emergency temporary custody of Ryker and Amira'Lynn. The children have remained in out-of-home placement during the entirety of this case.

Following an August 2023 adjudication hearing, the juvenile court found that the allegations in the State's adjudication petition were true by a preponderance of evidence and continued the children's out-of-home placement. The juvenile court ordered Tasha to cooperate with an initial diagnostic interview with a substance abuse component, sign releases of information, refrain from using or possessing alcohol or controlled substances, and submit to drug and alcohol testing. Following a dispositional hearing in September 2023, the juvenile court continued its prior orders in addition to ordering that Tasha participate in supervised parenting time, maintain a safe and stable living environment, maintain employment or other legal source of income, provide the case manager with her up-to-date contact information and address, maintain regular contact with the case manager, report any law enforcement contacts to her case manager, cooperate with family support, and ensure that the children's educational needs were being met.

### 4. RONNIE'S COMPLAINT TO INTERVENE

Shortly after Ryker's removal in May 2023, Ronnie was arrested on an outstanding warrant. He was convicted of aiding and abetting a robbery, possession of methamphetamine, and obstructing a peace officer. He was sentenced to a term of imprisonment, becoming eligible for parole in November 2025, with an expected release date in 2030.

In April 2024, while incarcerated, Ronnie sought leave to intervene in the juvenile proceedings as it related to Ryker. In June, the juvenile court found that Ronnie was Ryker's legal father and granted his request to intervene in the proceedings.

### 5. JULY 2024 REVIEW HEARING

Following a July 2024 review hearing, the juvenile court continued out-of-home placement, continued all prior orders related to Tasha, and ordered Ronnie to sign releases of information as requested by DHHS, participate in therapeutically supervised visits with Ryker once he is available in the community, maintain a safe and stable living environment, maintain employment or other legal source of income, provide the case manager with up-to-date contact information and address, maintain regular contact with the case manager, and report any law enforcement contacts to the case manager.

### 6. MOTION FOR TERMINATION OF PARENTAL RIGHTS

On August 21, 2024, the State filed a motion for termination of Ronnie's parental rights based upon Neb. Rev. Stat. § 43-292(2) (Reissue 2016) (substantial and continuous and repeated neglect and refusal to provide necessary parental care and protection) and § 43-292(7) (out-of-home placement for 15 or more months of most recent 22 months). The motion also alleged that termination of Ronnie's parental rights was in Ryker's best interests.

That same day, the State filed a petition for termination of Tasha's parental rights to both Ryker and Amira'Lynn based upon § 43-292(2) (substantial and continuous or repeated neglect and refusal to provide necessary parental care and protection); § 43-292(6) (reasonable efforts failed to correct conditions leading to adjudication); and § 43-292(7) (out-of-home placement for 15 or more months of most recent 22 months). The petition also alleged that termination of Tasha's parental rights was in the minor children's best interests.

## 7. Trial

The termination hearing was held in December 2024. Testimony was adduced from Kylie Haseloh, a child and family services specialist; Nicole Lemke, a child and family services specialist supervisor; Ronnie; and Constance R., Tasha's mother.

### (a) Kylie Haseloh's Testimony

Haseloh testified that she was the caseworker in this case from August 2023 until October 2024. Haseloh initially met with Tasha in September 2023, and a courtesy worker was assigned to visit Ronnie monthly while he was incarcerated. Haseloh testified that overall, progress to reunify the children with Tasha had been poor. Haseloh testified that throughout the pendency of the case, Tasha failed to maintain consistent communication with her, failed to maintain safe and stable housing and employment, failed to provide updated contact information, failed to consistently participate in visitation, failed to submit to drug and alcohol testing or refrain from substances and alcohol, and failed to attend recommended substance abuse treatment.

Haseloh testified that although Tasha completed two co-occurring evaluations, she did not follow the recommended treatments. According to Haseloh, Tasha failed to enter a scheduled treatment program, was unsuccessfully discharged from an intensive outpatient program for lack of participation, failed to consistently participate in drug testing, and had several presumptive positive drug test results. Tasha's participation in supervised visitation was inconsistent (missing or cancelling several visits per month for various reasons) and she went through at least two visitation companies while Haseloh was assigned to the case. Haseloh testified that there were times when Tasha was homeless, staying with others, or living in her van. Haseloh testified that during her tenure as case manager, most of her contact and communication with Tasha was hostile.

As it related to Ronnie, Haseloh testified that Ronnie had not been established as Ryker's legal father at the time that Ryker was removed from Tasha's care, but genetic testing later confirmed that Ronnie was Ryker's biological father. Haseloh testified that her only communication with Ronnie was one text message he had sent to her, regarding setting up an evaluation and visitation with Ryker. Haseloh testified that a courtesy worker had been assigned to meet with Ronnie monthly in person at the jail and would then insert her notes from her in-person meetings with Ronnie into their database. Haseloh testified that due to Ronnie's incarceration, no services were provided to him. And, although the State never sought adjudication of Ryker based on the faults or habits of Ronnie, Haseloh testified that DHHS had not been able to recommend reunification of Ryker with Ronnie.

### (b) Nicole Lemke's Testimony

Lemke, a child and family services specialist supervisor, testified that she first became involved with the family in 2021 in a prior open juvenile case during which Ryker had been removed from Tasha's care, and that she was currently the supervisor assigned to the present case.

Lemke testified that Ronnie failed to provide a stable environment for Ryker due to his incarceration during the pendency of this case and that Ronnie was not eligible for parole until November 2025 and his release date was in 2030. Lemke testified that because visitation between Ronnie and Ryker was not recommended, DHHS did not inquire into the possibility of establishing visitation. She further testified that no evaluation of Ronnie was conducted because evaluations

and recommendations expire after 6 months, and a new evaluation referral would need to be completed by the time he was released. Lemke acknowledged that Ronnie sent letters and cards for Ryker to Tasha's parents, but that was the extent of Ronnie's contact with Ryker during the case. Lemke testified that based on her experience, training, expertise, review of the current case, Ryker's young age, and her knowledge of Ronnie's lack of cooperation with services in the prior case, it was her opinion that termination of Ronnie's parental rights was in Ryker's best interests.

As it related to Tasha, Lemke testified that during this case, Tasha only participated in 22 out of 172 drug tests and, of those 22 tests, Tasha continued to test positive. Lemke testified that although Tasha reported that she was participating in intensive outpatient programming (IOP), her therapist informed her that they were unable to start any IOP treatment due to Tasha's inconsistency. Further, of the 189 visits offered to Tasha between September 2023 and September 2024, Tasha missed 49 of the scheduled visits. Additionally, at the time of the trial, Tasha had not maintained safe and stable housing, and, according to Lemke, Tasha was residing in her van with Amira'Lynn's father. Lemke testified that based on her training, experience, her discussions with Tasha, Tasha's current status, the length of time the case had been open and the total amount of time that the children had been in DHHS' care, it was her opinion that termination of Tasha's parental rights was in Ryker and Amira'Lynn's best interests.

### (c) Ronnie's Testimony

In his testimony, Ronnie acknowledged that his criminal history and substance use was a problem but stated that he had taken steps to better himself. Although Ronnie testified that he was convicted of aiding and abetting a robbery, he stated that the crime itself did not involve any violence, contrary to Lemke's testimony, and that the probable cause affidavit attached to the certified copy of his criminal case, which was admitted into evidence, provided the specific, nonviolent details of the crime.

Ronnie testified that during his initial incarceration, he could not participate in any programming, but he had been a baker and prep cook in the kitchen, and since moving to the Reception and Treatment Center (RTC) in November 2024, he completed programming, including courses in Adapting to Change, Anger Management, Choosing the Best Solution, Cognitive Awareness, Contentious Relationships, Keys to Reentry, Substance Abuse, How to Be a Better Parent, and a second anger management course. Ronnie further testified that he had maintained good behavior since being incarcerated.

Ronnie testified that he met with the courtesy worker monthly and that he initiated a text conversation with the ongoing caseworker, attempting to set up services and visitations with Ryker. In response to whether Ronnie wanted to maintain an ongoing relationship with Ryker, Ronnie stated, "Absolutely, that's why I started writing the letters and trying to get visitation and phone calls. That's why I've tried to do these classes that I just recently started doing 'cause I didn't have the opportunity previous to RTC." Ronnie further stated that he received updates concerning Ryker through Tasha's parents, who had weekend visitation. Ronnie testified that if he is released, it was his intention to participate in any services offered by DHHS. Ronnie acknowledged that in the prior case he attended visits consistently until he absconded from probation and that his lack of contact with Ryker at that point was his fault.

Ronnie acknowledged that since Ryker's birth in 2020, apart from his current incarceration, he had previously been in jail on a couple of occasions and had been in prison from April 2021 to September 2022, but that he was in custody at Buffalo County before he was released by the Department of Correctional Services. Ronnie testified that after he was released from custody in November 2022, he resided in multiple places, including a halfway house in Lincoln, Nebraska, and a residence in Iowa. Ronnie was subsequently arrested again in May 2023 for which he is serving his current sentence. Ronnie testified that between November 2022 and May 2023, he only saw Ryker two or three times but frequently spoke on the phone with him. He stated that hostilities with Amira'Lynn's father, Tasha's current partner, prevented him from seeing Ryker more often.

### (d) Constance R.'s testimony

Constance testified that since Ryker's removal, she and her husband had weekend visits with Ryker. She testified that she maintained telephone contact with Ronnie and provided Ronnie with updates on Ryker. Constance stated that Ronnie has written approximately 17 letters to Ryker and that she and her husband have read some of the letters to Ryker.

### 8. TERMINATION ORDER

In December 2024, the juvenile court entered an order terminating Tasha and Ronnie's parental rights. As it related to Tasha, the juvenile court found that grounds existed to support termination under § 43-292 (2), (6), and (7) and that termination of Tasha's parental rights was in Ryker and Amira'Lynn's best interests. The juvenile court further found that as to Ronnie, the State found that statutory grounds existed to support termination under § 43-292 (2) and (7) as a result of Ronnie's extensive history of arrest and incarceration and that termination of Ronnie's parental rights was in Ryker's best interests.

The juvenile court, in considering Ryker's best interests, stated:

The evidence presented established that [Ronnie] did make attempts to maintain a relationship with [Ryker], through inquiring about him during monthly contacts with the DHHS courtesy worker, sending cards, letters and small gifts to his child through the maternal grandparents, and attempting to contact the DHHS workers assigned to [Ryker's] case. However, the evidence was clear that [Ronnie] was limited to these minimal contacts due to his incarceration from May 18, 2023[,] through the present day. The evidence was also clear that the earliest date that it may be possible for [Ronnie] to be released would be November 2025, which was dependent entirely on the outcome of whether he would be granted parole. Even if [Ronnie] were to be released 11 months from now, the testimony of . . . Lemke from DHHS indicated that [DHHS] would need to see a period of stability and sobriety before [Ronnie] could be considered for placement of [Ryker].

. . . .

. . . In the present case, similarly to [*In re Interest of Zanaya W.,* 291 Neb. 20, 863 N.W.2d 803 (2015),] the incarceration of [Ronnie] alone was not the sole basis offered for termination of parental rights. The State also showed what crimes [Ronnie] was incarcerated for, as well as crimes committed when he had . . . contact with his son [in] the prior case. Evidence was also presented regarding [Ronnie's] substance abuse history, and lack of access to substance use treatment to date due to his incarceration. [Ronnie's] history

during the lifetime of his son supports a finding that he is unfit. As previously stated, the evidence supports that Ryker deserves permanency. The Court recognizes the very recent efforts [Ronnie] has made in accessing classes available to him to better himself as a parent. There was no evidence presented which indicated that [Ronnie] is unwilling to rehabilitate himself. However, his incarceration makes him unable to do so in a reasonable period of time. Case law dictates that when, "a parent is unable or unwilling to rehabilitate himself or herself within reasonable period of time, the child's best interests require termination of parental rights." *In re interest of Leyton C. & Landyn C.,* 307 Neb. 529, 949 N.W.2d 773 (2020). Accordingly, the Court finds by clear and convincing evidence that termination of [Ronnie's] parental rights is in [Ryker's] best interests.

Ronnie now appeals, and Tasha cross-appeals, from the juvenile court's order terminating their parental rights.

## III. ASSIGNMENTS OF ERROR

Ronnie assigns, restated, that the juvenile court erred in (1) finding that the State proved statutory grounds existed to terminate his parental rights under § 43-292(2) and (2) finding that termination of his parental rights was in Ryker's best interests.

On cross-appeal, Tasha assigns as error that the juvenile court erred in (1) failing to give her more time to work towards reunification and (2) finding that termination of her parental rights was in the minor children's best interests.

## IV. STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id.*

## V. ANALYSIS

Ronnie's appeal and Tasha's cross-appeal raise similar arguments. First, although the juvenile court terminated Ronnie's parental rights pursuant to § 43-292(2) and (7) and the juvenile court terminated Tasha's parental rights pursuant to § 43-292(2), (6), and (7), neither party assigns nor argues that the juvenile court erred in terminating their parental rights pursuant to § 43-292(7). Both Ronnie and Tasha assign as error that the court erred in finding that termination was in the minor child or children's best interests. Because Ronnie and Tasha's assigned errors involve an application of the same juvenile law, we combine the discussion of the relevant law and apply that law to Ronnie and Tasha's unique factual circumstances.

### 1. STATUTORY BASIS FOR TERMINATION

To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

We first address whether the court erred in terminating Ronnie and Tasha's parental rights pursuant to § 43-292(7). Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *Id*. In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id.* And, as the Nebraska Supreme Court recently clarified in *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023), the trigger date for determining the look back period for grounds under § 43-292(7) is the date that the petition for termination of parental rights is filed.

In the present case, the evidence established that Ryker and Amira'Lynn were placed in the care and custody of DHHS on May 4, 2023, and remained in out-of-home placement during the pendency of the case. At the time of the filing of the petitions to terminate Ronnie and Tasha's parental rights on August 21, 2024, the minor children had continuously been in out-of-home placement for 15 of the most recent 22 months. Because both minor children have been in out-of-home placement for 15 of the most recent 22 months, we find that the juvenile court did not err in finding that statutory grounds existed for termination of Ronnie and Tasha's parental rights under § 43-292(7).

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al*., 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because a statutory basis supporting termination of both Ronnie and Tasha's parental rights was proven pursuant to § 42-292(7), we need not consider whether termination was also appropriate pursuant to § 42-292(2), and we proceed to consider whether termination of Ronnie's parental rights was in Ryker's best interests and whether termination of Tasha's parental rights was in the best interests of Ryker and Amira'Lynn.

2. BEST INTERESTS

Next, both Ronnie and Tasha contend that the juvenile court erred in finding that termination of their parental rights was in the minor child or children's best interests.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. § 43-292. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id*. Although the term "unfitness" is not expressly used in § 43-292, the concept is generally encompassed by the fault and neglect subsections of that statute and is also embedded in a determination of the child's best interests, which is under consideration in this appeal. *Id.* We have defined parental unfitness as "a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in,

detriment to a child's well-being." *Id.* Analysis of the minor child's best interests and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

(a) Best Interests - Ronnie

Ronnie contends that "[t]he entire premise of the State's argument rests on [his] status of incarceration" and that his "unfitness as determined by the court, appears to be seated primarily in [Ronnie's] incarceration" even though "some additional concerns" were noted by the court. Brief for appellant at 16.

Although parental rights may not be terminated solely for a parent's incarceration, parental incarceration is a factor which may be considered in determining whether parental rights should be terminated. *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992). It is proper to consider a parent's inability to perform parental obligations because of imprisonment, the nature of the crime committed, as well as the person against whom the criminal act was perpetrated. *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999). See, also, *In re Interest of Joezia P.*, 30 Neb. App. 281, 968 N.W.2d 101 (2021). Incarceration of a parent is not supposed to insulate an inmate from termination of his or her parental rights if the record contains clear and convincing evidence that would support the termination of the rights of any other parent. *In re Interest of Brettany M. et al.*, 11 Neb. App. 104, 644 N.W.2d 574 (2002).

Prior to his incarceration, although Ronnie was present at the hospital when Ryker was born and engaged in some voluntary services during the prior DHHS case, the evidence shows that Ronnie did not sign Ryker's birth certificate, attempt to serve in a parental capacity, or attempt to establish a strong attachment with Ryker. While we recognize that Ronnie worked in the kitchen during his incarceration, participated in some programming, and remained in contact with the courtesy worker, the evidence demonstrated that during both the prior case and the present case, Ronnie engaged in criminal behavior that led to his incarceration on multiple occasions. In fact, the evidence shows that since Ryker's birth in July 2020, Ronnie spent more time incarcerated than he did with Ryker.

At the time of Ryker's removal in the prior case, Ronnie had pending drug possession charges against him and was on probation. Despite Ryker's removal from Tasha and Ryker's need for stability, Ronnie absconded from probation in order to avoid arrest. During the time he absconded, Ronnie stopped participating in the supervised visitation services being offered and was discharged by the provider.

During the pendency of the present case, following Ryker's removal, Ronnie continued to engage in criminal activity and was subsequently convicted and sentenced for possession of methamphetamine, aiding and abetting a robbery, and obstructing a peace officer. In his own testimony, Ronnie acknowledged that he had been in custody more than he had been out of custody since Ryker was born. Further, despite testifying that he was aware of Ryker's removal in May 2023, Ronnie waited over a year, until April 2024, to establish paternity and intervene in the present case. Further, in April 2022, during the prior DHHS case, Ronnie moved for genetic testing, which was granted by the court, but was never completed because Ronnie absconded.

As a result of Ronnie's voluntary decision to engage in criminal conduct following Ryker's birth, Ronnie had inconsistent interactions and contact with Ryker. At the time of the termination

trial, Ronnie had not had any contact with Ryker since Ryker's removal in May 2023. Prior to that, during the 6-month timeframe between the close of the prior case and the initiation of the present case, Ronnie admitted that he only saw Ryker two or three times, due to what he alleged was Tasha's relationship with Amira'Lynn's father, although he testified that he and Ryker spoke on the phone frequently.

Based on our de novo review of the record, when considering Ronnie's inconsistent contact with Ryker and his failure to establish or participate in parental functions and serve in a parental role for Ryker prior to his incarceration; Ronnie's failure to intervene in the proceedings for over a year after Ryker was removed despite being notified of Ryker's removal; Ronnie's voluntary choice to engage in criminal conduct resulting in his incarceration, despite being aware of Ryker's removal from Tasha's home; Ronnie's pattern and history of criminal behavior and substance abuse concerns; the amount of time Ryker spent in foster care during his short life; Ronnie's November 2025 parole date and 2030 expected release date, together with whatever time it would take to determine whether and if Ronnie would be prepared to parent Ryker, with whom he has never established a relationship; and amount of time Ryker would continue to languish in foster care waiting for Ronnie to put himself in a position to provide for Ryker's needs, we find that the juvenile court did not err in finding that termination of Ronnie's parental rights was in Ryker's best interests.

### (b) Best Interests - Tasha

On cross-appeal, Tasha contends that the juvenile court erred in finding that termination of her parental rights was in the best interests of Ryker and Amira'Lynn.

Here, both Ryker and Amira'Lynn have been in out-of-home placement for over 15 of the past 22 months. When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). The 15-month condition contained in § 43-292(7) provides a reasonable timetable for parents to rehabilitate themselves. *Id*. During this case, despite the fact that DHHS has provided Tasha with numerous services, she has failed to put herself in a position to reunify with her children.

The evidence in this case established that during the pendency of the case, Tasha continued to use substances, refused to participate in drug testing, did not maintain housing or employment, did not consistently participate in visitation, and did not follow recommended substance abuse treatment. Tasha never progressed beyond supervised visitation and her visits were reduced by the visitation agency due to her inconsistent participation. Tasha also failed to stay in contact with the caseworker and at times became aggressive with the workers. Both the prior child and family services specialist and the current CFS supervisor testified that Tasha's overall progress had been poor. Stated simply, during this case Tasha had multiple opportunities to rehabilitate herself, to correct the conditions that led to the adjudication, and to place herself in a position to parent her children, but she failed to do so. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). On this record, we find by clear and convincing evidence that termination of Tasha's parental rights is in the best interests of Ryker and Amira'Lynn.

## VI. CONCLUSION

As stated above, we affirm the juvenile court's termination of Ronnie and Tasha's parental rights to their respective children.

AFFIRMED.